John GORMAN, Plaintiff,

v.

WOLPOFF & ABRAMSON, LLP, et al., Defendants.

No. C 04–04507 JW.

United States District Court, N.D. California, San Jose Division.

June 23, 2006.

---

Craig Alan Hansen, John C. Gorman, Gorman & Miller, San Jose, CA, for Plaintiff.

Tomio B. Narita, Jeffrey A. Topor, Wineberg, Simmonds & Narita LLP, San Francisco, CA, for Defendants.

**ORDER GRANTING DEFENDANT MBNA'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANT WOLPOFF & ABRAMSON'S MOTION FOR SUMMARY JUDGMENT; DENYING DEFENDANT WOLPOFF & ABRAMSON'S REQUEST FOR FINDING OF BAD FAITH; SETTING HEARING ON ORDER TO SHOW CAUSE RE: RULE 11 SANCTIONS**

WARE, District Judge.

## I. INTRODUCTION

John Gorman ("Gorman" or "Plaintiff") alleges libel and violations of various state and federal fair credit reporting and debt collection statutes against MBNA and MBNA's attorney, Wolpoff & Abramson, ("Wolpoff," collectively "Defendants"). MBNA and Wolpoff each filed a Motion for Summary Judgment. On June 5, 2005, the Court held a hearing on Defendants' Motions. Based on the papers filed to date and the statements of counsel at the hearing, the MBNA's Motion for Summary Judgment is GRANTED, Wolpoff's Motion for Summary Judgment is GRANTED and Request for Finding of Bad Faith is DENIED.

## II. BACKGROUND

Gorman is an attorney and a former holder of a MBNA Visa credit card. (Second Amended Complaint, Docket Item No. 41, "SAC" at ¶¶ 1, 4.) "In or about January and February 2003," Gorman disputed the legitimacy of credit card charges from "Four Peaks Entertainment" ("Four Peaks") that were posted to his account. (SAC ¶¶ 7, 8.) According to Gorman, Four Peaks shipped defective equipment that could not be successfully installed, and a Four Peaks installer damaged Gorman's roof. (SAC ¶ 7). Upon receiving written notification from Gorman, MBNA temporarily removed the charges, but later reposted them and refused to remove them again. (SAC ¶ 8.) MBNA retained Wolpoff & Abramson, a law firm that handles debt collection cases, to initiate legal action against Gorman. (SAC ¶¶ 2, 9.) According to the SAC, MBNA and Wolpoff placed "at least several hundred telephone calls" to Gorman regarding his alleged debt. (SAC ¶ 10.) Gorman provides a single example of receiving multiple telephone calls during a dinner party at his residence on August 14, 2003 where he asked the caller to cease calling, but the calls continued. (SAC ¶ 10.)

In Spring of 2004, Gorman discovered that MBNA "falsely reported" to various credit reporting agencies that he was delinquent on his obligations to MBNA, without reporting that the debt was "disputed." (SAC ¶¶ 11, 12.) Gorman alleges that on May 6, 2004, he notified Equifax, Trans Union, and Experian (collectively, "CRAs") in writing that the information provided by MBNA was mistaken. (SAC ¶ 12.) The CRAs subsequently informed him that MBNA would not make any changes or corrections, and MBNA did not inform the CRAs that the alleged debt was disputed. (SAC ¶ 12.) Gorman also alleges that he wrote to MBNA on September 15, 2004, requesting that it correct the information, but MBNA did not take any corrective action. (SAC ¶ 12.)

On May 4, 2005, the Court dismissed Gorman's First Amended Complaint, but granted leave to amend as to particular allegations. The SAC alleges causes of action for libel and violations of the Fair Credit Reporting Act ("FCRA") 15 U.S.C. §§ 1681n, 1681o against Defendant MBNA. The SAC also contains a cause of action for violations of the Fair Debt Col-

lection Practices Act ("FDCPA") §§ 1692c, 1692d against Defendant Wolpoff. MBNA and Wolpoff each move for summary judgment.

## III. STANDARDS

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex v. Catrett,* 477 U.S. 317, 323–324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548. If this burden is met, the moving party is then entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing on an essential element with respect to which the non-moving party bears the burden of proof at trial. *Id.* at 322–23, 106 S.Ct. 2548.

The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The non-moving party cannot defeat the moving party's properly supported motion for summary judgment simply by alleging some factual dispute between the parties. To preclude the entry of summary judgment, the non-moving party must bring forth material facts, i.e., "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505,

91 L.Ed.2d 202 (1986). The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The court must draw all reasonable inferences in favor of the non-moving party, including questions of credibility and of the weight to be accorded particular evidence. *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 520, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991) (citing *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505); *Matsushita,* 475 U.S. at 588, 106 S.Ct. 1348; *T.W. Elec. Serv. v. Pac. Elec. Contractors,* 809 F.2d 626, 630 (9th Cir.1987). It is the court's responsibility "to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." *T.W. Elec. Serv.,* 809 F.2d at 631. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348.

## IV. DISCUSSION

### A. FCRA Claims

Because there is no private right of action under § 1681s–2(a), *Nelson v. Chase Manhattan Mortgage Corp.,* 282 F.3d 1057, 1059 (9th Cir.2002), Gorman's § 1681n and § 1681o claims survive summary judgment only if Gorman can base them on willful and negligent violations of § 1681s–2(b). *See Gorman v. Wolpoff &*

*Abramson,* 370 F.Supp.2d 1005, 1012 (citing *Nelson* ). Unlike § 1681s–2(a) which imposes a "duty of furnishers of information to provide accurate information," § 1681s–2(b) is directed to the "duties of furnishers of information upon notice of dispute." In relevant part, § 1681s–2(b) provides:

> After receiving notice pursuant to section 1681i(a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall—
>
> (A) conduct an investigation with respect to the disputed information;
>
> (B) review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2) of this title;
>
> (C) report the results of the investigation to the consumer reporting agency;
>
> (D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and
>
> (E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation promptly—
>
> > (i) modify that item of information;
> >
> > (ii) delete that item of information; or
> >
> > (iii) permanently block the reporting of that item of information.

The SAC contains a conclusory allegation that "[o]n information and belief, MBNA ... [was] notified by the various credit reporting agencies of the existence of plaintiff's dispute yet failed to conduct a complete and sufficient investigation." (SAC ¶ 12.)

The record indicates MBNA conducted an investigation of the initial Four Peaks charge, (Decl. of Kristin Lepley in Support of Mot. for Summ. J. by Def. MBNA, Docket Item No. 53 ("Lepley Decl.") at ¶ 5–15), as well of each of Gorman's four disputes received from the CRAs (Lepley Decl. ¶ 17–20.) MBNA received a customer dispute form from TransUnion dated May 13, 2004 regarding Gorman's account which read "Claims company will change. Verify all account information." (Lepley Decl., Exh. 2.) By declaration, Ms. Lepley, a compliance officer in the customer assistance department of MBNA (Lepley Decl. ¶ 1), stated that MBNA reviewed its account notes for Gorman's account and determined that MBNA had not agreed to delete any charges or to modify the account information in any way. MBNA found that there were some minor differences such as birthdate and address information between MBNA and TransUnion's records, and MBNA submitted this information to TransUnion along with additional delinquency information concerning Gorman's account. (Lepley Decl. ¶ 17.) MBNA received three other customer dispute forms: (1) from Experian, dated May 18, 2004, stating: "Customer claims account take over, fraudulent charges made on account. Verify signature provide complete ID." (Lepley Decl., Exh. 3.), (2) from Experian, dated December 20, 2004, stating: "Claims inaccurate information. Did not provide specific dispute. Provide complete ID and verify account information" and under "FRCA Relevant Information" reads: "Promised goods/services not delivered. I timely disputed the charges under the TIL Act," and (3) from TransUnion, dated November 29, 2005, stating "Disputes present/previous Account Status History," and "Customer claims account take-over fraudulent charges made on ac-

count," was also investigated in a similar manner. (Exh. 3–5.) MBNA's investigation as to each of these customer dispute forms was similar to the investigation conducted upon receipt of the May 13, 2004 TransUnion dispute form. (Lepley Decl. ¶¶ 18–20.)

■ Based on the content of the these customer dispute forms from the CRAs and Ms. Lepley's description of the MBNA's subsequent investigations, Gorman, as the party that bears the burden of proof as to a § 1681s–2(b) violation, must raise a genuine issue of material fact that MBNA's investigation was not reasonable.

Gorman primarily alleges that the error that MBNA reported to the CRAs was that the charges were not marked disputed when reported. As an initial matter, Gorman has not presented any evidence in the record, beyond his belief at deposition, that MBNA did not report the account as disputed. Such a lack of evidence alone could be sufficient to find that Gorman has not raised a genuine issue of material fact as to this claim against MBNA. Assuming arguendo that MBNA failed to report the account as disputed to the credit agencies, such a violation of § 1681s–2(a) is not before this Court. Gorman must raise a genuine issue of material fact as to the reasonableness of MBNA's investigation under § 1681s–2(b).

At his deposition, Gorman maintains that MBNA's investigation was unreasonable because (1) MBNA did not resolve the dispute in his favor, and (2) MBNA did not contact him with respect to the disputed charges. As to Gorman's first objection, Gorman places the boat before the tug— the reasonableness of the investigation address the procedures of the investigation and is not an assessment of the outcome. If Gorman is also arguing that his belief that his dispute was bona fide should have been self-evident to anyone reviewing the record, and thus the investigation was un-

reasonable, such an argument is similarly circular.

As to Gorman's second argument that MBNA's investigation was unreasonable because MBNA did not contact him regarding the disputed charges, this Court is persuaded by the reasoning in the Seventh Circuit that a furnisher of credit information need not contact a debtor who disputes a debt. *Westra v. Credit Control of Pinellas,* 409 F.3d 825, 827 (7th Cir.2005) ("requiring a furnisher to automatically contact every consumer who disputes a debt would be terribly inefficient and such action is not mandated by the FCRA"). Furthermore, it is also unclear what further information Gorman could have provided MBNA beyond the information in his letter to MBNA dated August 7, 2003. (*See* Narita Decl., Exh. A, Gorman Depo., 107:12—121:16.)

Although reasonableness is ordinarily an issue for the trier of fact, Gorman must raise "facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Because both of Gorman's objections are insufficient as a matter of law to raise genuine issues of material fact, and Gorman has not raised any other objections to the reasonableness of MBNA's investigation, summary judgment on the FCRA claim is granted in favor of MBNA.

**B. State Law Libel Claims**

■ As the Court stated in the Order Granting Motions to Dismiss (Docket Item No. 37), regulation of MBNA's responsibilities as a furnisher of information to credit reporting agencies is generally preempted by 15 U.S.C. § 1681t(b), but § 1681h(e) permits Gorman to state a cognizable libel claim by alleging "malice" or "willful intent to injure." *Gorman,* 370 F.Supp.2d at 1009–10. The Court instructed Gorman to

amend his complaint "to identify which statements are libelous and when they were made." *Id.* at 1010.

MBNA argues that Gorman's libel claim is preempted because Gorman has failed to present evidence of malice or willful intent to injure. Because the issue is whether Gorman's state law claim is preempted by the FCRA, the interpretation of "malice" or "willful intent to injure" in the FCRA is a question of federal statutory interpretation, and not a question of state law as Gorman contends in his Opposition (Docket Item No. 70, "Opp." at 14). The FCRA does not define "malice" or "willful intent to injure," and the Ninth Circuit has not defined the terms in the context of the FCRA. Other district courts, however, have concluded that "[i]n cases interpreting the FCRA's relationship to state law claims of defamation and invasion of privacy, the phrase 'malice' in § 1681h(e) has been interpreted to be 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Hukic v. Aurora Loan Services, Inc.,* No. 05 C 4950, 2006 WL 1457787 at *3 (N.D.Ill. May 22, 2006).

MBNA has provided evidence that they did not act with "malice" or with "willful intent to injure" Gorman. MBNA investigated Gorman's dispute as to the Four Peaks incident, and concluded that since Gorman never returned the merchandise, Gorman was not entitled to a reversal of the charges, and the account balance would be charged off to Wolpoff for collection. (Lempley Decl. ¶¶ 5–16.)

In light of MBNA's showing, Gorman must raise a genuine issue of material fact that his claim is not preempted by 15 U.S.C. § 1681t(b) because MBNA acted with "malice" or with a "willful intent to injure." Gorman's Opposition states only that Gorman made multiple written demands to MBNA, but MBNA continued to "report the account as delinquent without including a notation that the debt is disputed by the account holder." (Plaintiff's Opposition to MBNA's Motion for Summary Judgment, "Opp. to MBNA" (Docket Item No. 70) at 13.) However, simple allegations are insufficient at the summary judgment stage. The record does not include any credit reports that report a delinquency but do not include the notation requested by Gorman. Nor has Gorman presented any evidence that MBNA has made untruthful representations to the CRAs. As the non-moving party with the ultimate burden of proof at trial, Gorman need not present evidence that would be admissible at trial in order to defeat a motion for summary judgment, but he may not rely on "mere pleadings." *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. Because Gorman has not raised a genuine issue of material fact as to "malice" or "willful intent to injure," summary judgment is granted in favor of MBNA that Gorman's state law libel claim is preempted by the FCRA.

## C. FDCPA

### 1. Meaningful Involvement

Gorman's Opposition to Wolpoff's Motion for Summary Judgment raises, for the first time, an allegation that Wolpoff violated § 1692(e)(3) by sending a collection letter on law firm letterhead without first having an attorney at the firm conduct a meaningful review of the circumstances surrounding Gorman's alleged debt. Gorman appears to rely on a decision in the Second Circuit finding Wolpoff liable for such a violation. (Plaintiff's Opposition to Wolpoff's Motion for Summary Judgment, "Opp. to Wolpoff" (Docket Item No. 71) at 7–9) (citing *Miller v. Wolpoff & Abramson, LLP,* 321 F.3d 292 (2d Cir.2003).)

█ This new allegation in Gorman's Opp. to Wolpoff is dismissed as procedurally improper. Gorman's SAC only alleges

violations of §§ 1692(c) and 1692d against Defendant Wolpoff; no violations of § 1692(e) are alleged. A plaintiff may not raise a new theory of liability for the first time, after the close of discovery, in his opposition to summary judgment without amending his complaint. *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir.2000). In the Ninth Circuit, a district court is not required to permit an amendment of the complaint to include a claim first raised in the summary judgment papers. *Id.* at 1294–95. The court in *Coleman* determined that the plaintiffs "must show good cause for not having amended their complaints" which "primarily considers the diligence of the party seeking the amendment." *Id.* at 1295 (citing *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607–09 (9th Cir.1992)). Thus, even if Gorman had wished to amend the SAC at this late stage, the Court may deny such a motion based on Gorman's inability to show that he has been diligently seeking such an amendment, or any other good cause for the delay.

It is also apparent from this record that such an amendment would be futile. Wolpoff has provided evidence that an attorney at Wolpoff reviewed Gorman's file on January 9, 2004, prior to the sending of a collection letter dated January 12, 2004. (Decl. of Ronald Cantor, Exh A., BATES WA 0006.) Gorman's response to this evidence is twofold. First, Gorman argues that the evidence is inadmissible hearsay. The Court notes that by Mr. Cantor's declaration authenticating the records, it appears that the evidence may be admissible under the business records exception to the hearsay rule. Second, Gorman contends that "[i]f a file review had been conducted by a Wolpoff attorney, the attorney apparently did not note (or simply ignored) plaintiff's August 7, 2003 letter.... If the Wolpoff attorney was aware of this letter, he or she would know that by sending the January 12, 2004 collection letter and initiating a series of collection calls, Wolpoff was committing a flagrant violation of 15 U.S.C. § 1692c(c)." This Court declines to permit any failure of a law firm to comply with the FDCPA to be automatically bootstrapped into a violation of § 1692(e)(3) simply based on what an attorney should have known.

### 2. Telephone Calls

■ In his FAC, Gorman alleges that Wolpoff's calls to him violated the FDCPA. To the extent that Gorman alleges that these calls violated the FDCPA because Gorman notified MBNA about his desire to not be called, Gorman's claim fails as a matter of law. While the Ninth Circuit has not addressed the issue of whether a creditor's knowledge may be imputed to a debt collector, this Court is persuaded by the reasoning in the Seventh Circuit:

> A distinction between creditors and debt collectors is fundamental to the FDCPA, which does not regulate creditors' activities at all. Courts do not impute to debt collectors other information that may be in creditors' files-for example, that debt has been paid or was bogus to start with. This is why debt collectors send out notices informing debtors of their entitlement to require verification and to contest claims.

*Randolph v. IMBS, Inc.*, 368 F.3d 726, 729 (7th Cir.2004). *See also Schmitt v. FMA Alliance*, 398 F.3d 995, 997 (8th Cir.2005) (imputing a creditor's actual knowledge of a debtor's representation to the debt collector "contradicts established agency law, which dictates that while the knowledge of the agent is imputed to the principal, the converse is not true"). Based on the reasoning in *Randolph* and *Schmitt*, Gorman may not base a violation of the FDCPA on his statements to MBNA.

As to Gorman's allegations based on his statements to Wolpoff and based on ac-

tions actually attributable to Wolpoff, Gorman has significantly narrowed his allegations from the "several hundred" phone calls alleged in the FAC and SAC:

> The request that Wolpoff not call was also communicated directly to Wolpoff personnel, as confirmed by two auto dialer exclusion notations contained in Wolpoff's own records. Yet Wolpoff placed at least thirteen calls to Gorman's residence during a six-week period. Moreover, many of the calls were made outside of normal business hours (two of which appear to reflect that they were made past 9:00 p.m.). In total, Wolpoff acknowledges that it and its "auto-dialer" placed at least 24 calls to Gorman's home and place of business during a six-week period despite being asked not to do so. The placing of these calls was in violation of § 1693d's prohibition against "repeated" or "continuous" phone calls.

Opposition at 14:1–8. As framed in the Opposition, the only evidence of the number of the calls made by Wolpoff is Wolpoff's call log. The only evidence of the time of day at which Wolpoff made these calls is also Wolpoff's call log. The record does not contain any other evidence of calls from Wolpoff other than this call log.

The evidence in the record demonstrates that Gorman's interpretation of Wolpoff's call log is inaccurate. Wolpoff's call logs indicate that no calls were made after February 22, 2004, following a notation on the call log that Wolpoff had received a letter from the debtor. By declaration, Wolpoff states that the "dialer exclusion" notation in the call log is a code indicating "that the collector coded the account would be placed for that day." (Supp. Decl. of Ronald Cantor in Supp. of Mot. for Summ. J., ("Supp. Cantor Decl."), Docket Item No. 83, at ¶ 2.) Wolpoff also represents that its automatic dialers are programmed on Eastern Standard Time, so it is evident from the call logs that none of the calls

were made after 9:00 p.m. local time. (Supp. Cantor Decl., at ¶ 3.)

Congress did not intend the FDCPA to completely bar any debt collection calls. By declaration, and as indicated in the call logs, Wolpoff only made contact with Mr. Gorman on a single occasion on February 4, 2004, and Wolpoff never attempted to contact Gorman at the same phone number more than two times on the same day. Even if the Court were to find that such acts were "repeated and continuous" Gorman has not attempted to raise a genuine issue of material fact as to the intent of Wolpoff in making these collection calls.

Upon Wolpoff's showing of the absence of a triable issue on which Mr. Gorman ultimately bears the burden at trial, Mr. Gorman must raise a genuine issue of material fact that Wolpoff violated the FDCPA as alleged in the SAC. While this Court must draw all reasonable inferences in favor of the non-moving party, Mr. Gorman, the Court also requires that Mr. Gorman direct this Court to evidence in his favor. In his deposition, and in his Opposition to Wolpoff's present motion, Mr. Gorman alleges very few facts relating to Wolpoff specifically, and presents even less evidence of Wolpoff's actions. Mr. Gorman does not provide any evidence, even by his own deposition testimony or his declaration submitted in support of his opposition to the present motion, that a caller from Wolpoff called after he requested from Wolpoff that Wolpoff cease collection calls, or that Wolpoff called repeatedly and continuously. Nor does Mr. Gorman provide any evidence that Wolpoff called after 9:00 p.m. local time. A general allegation that Wolpoff calls are a subset of all collection calls, only invites speculation and does not raise a genuine issue of material fact as to the FDCPA claims asserted in the SAC against Wolpoff.

## D. Bad Faith Under the FDCPA

■ The FDCPA provides that "[o]n a finding by the court that an action under this section was brought in bad faith and for the purpose of harassment, the court may award to the defendant attorney's fees reasonable in relation to the work expended and costs." 15 U.S.C. 1692k (a)(3). In order to prevail there must be evidence that the plaintiff knew that his claim was meritless and that plaintiff pursued his claims with the purpose of harassing the defendant. *See Jacobson v. Healthcare Financial Services, Inc.*, 434 F.Supp.2d 133, 140–41, 2006 WL 1528959 at * 6 (E.D.N.Y. June 6, 2006) (granting Defendant's request for costs and attorney's fees pursuant to 1692k(a)(3) where the plaintiff's "mistaken belief that the alleged violation of the statute, arrived at merely by a strained construction of [the collection letter's] language, constitutes per se harassment is, in essence, a complaint against the creditor for the temerity of requesting that he pay what he owes").

■ Gorman's actions as to MBNA and Wolpoff are not entirely above suspicion. Gorman stopped making payments to his MBNA credit card after May 13, 2003 (Gorman Depo. 167:23–25) but then deliberately charged thousands of dollars more on his MBNA credit card on goods and services unrelated to the disputed $759.70 Four Peaks charge. In his letter to MBNA dated August 7, 2003, Gorman appears to be engaging in a self-help remedy in attempting to have MBNA stop collection on the entirety of his balance of over $5000: "My attorneys' fees exceed the amount owed on this account. Consequently I hereby assert the right to offset the legal fees against the account balance and I will not be making any further payments." (Lepley Decl. Exh. 12.)

As to Wolpoff in particular, the record is wholly devoid of support that Wolpoff made a serious portion of the "at least several hundred telephone calls to plaintiff" that Gorman alleges in the SAC were made by "MBNA, Wolpoff, and Does 1–20." (SAC ¶ 10.)

Despite these troubling undisputed facts in the record, the Court notes that MBNA has not moved for a finding of bad faith, and gives Gorman the benefit of the doubt that he may not have filed his entire lawsuit with the intent to harass MBNA and Wolpoff. Thus, the Court does not make an express finding that the entire suit was filed in bad faith and for the purposes of harassment as required for defendant to recover attorneys' fees under 1692k. *See Shah v. Collecto, Inc.*, 2005 WL 2216242 at *15 (D.Md. Sept.12, 2005).

## E. Rule 11

Although the Court, in an abundance of leniency, believes that Gorman may have been sufficiently confused about the legal rule so as to narrowly avoid a finding of bad faith under § 1692k (a)(3), Gorman's representations to the Court as to the factual allegations underlying his case runs afoul of FED. R. CIV. P. 11. Rule 11(b) requires that in all representations to the court an attorney conduct "an inquiry reasonable under the circumstances" and Rule 11(b)(3) requires that representations regarding "the allegations and other factual contentions" following such an inquiry "have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery."

Gorman, himself an attorney bound by the dictates of Rule 11, appeared before this Court to represent himself on April 25, 2005 at a hearing on Defendants' motion to dismiss. At that hearing, the following exchange took place:

The Court: Who made the calls?

Mr. Gorman: The law firm and the computer generated phone calls plus live people.

**The Court: What is your allegation as to who made them?**

**Mr. Gorman: It said the Defendants made them.**

**The Court: Who are the Defendants?**

**Mr. Gorman: Wolpoff & Abramson.**

The Court: I see MBNA and Does 1 through 100 and Wolpoff & Abramson Mr. Gorman: Correct. Every day there were three phone calls at all hours of the day and sometimes they would say we're calling from MBNA, and sometimes they would say we're calling from Wolpoff & Abramson, and sometimes it was a computer and the phone would keep ringing nonstop. It was classic bill collector harassment.

(Decl. of Tomio Narita in Support of Mot. for Summ. J. and Request for Finding of Bad Faith by Def. Wolpoff & Abramson LLP, Exh. B, Tr. of April 25, 2006 Hearing) (emphasis added). Gorman expressly represented to the Court that his allegation as to who made the calls was "Wolpoff & Abramson." As the subject of Wolpoff's alleged harassment, Gorman was in possession from the very outset of this suit of all the information about whether and how often Wolpoff had called; and yet, it was the Court, that reminded Gorman that MBNA and Does 1–100 may also have made these calls.

Based in part on Gorman's representations at the hearing of Wolpoff's involvement, this Court permitted Gorman to amend his Complaint against Wolpoff to allege an FDCPA violation arising out of Wolpoff's collection calls. Gorman's SAC, filed after the hearing and the Court's Order, alleged:

"Beginning in or about June and July 2003 and continuing through on or about February 20, 2004, defendants MBNA, Wolpoff, and Does 1–20 placed multiple telephone calls to plaintiff at both his residence and his office in an attempt to collect payment of the disputed charges. On information and belief, the defendants placed **at least several hundred telephone calls** to plaintiff despite being repeatedly instructed not to call. Such calls were placed at various times of the day, including early mornings and late at night, as well as on weekends."

(SAC ¶ 10, hereinafter "Paragraph 10") (emphasis added). The call log, as the only evidence of Wolpoff calls in the record, indicates that Wolpoff actually spoke to Gorman a single time out of Wolpoff's twenty-four attempts. Confusing the single Wolpoff call he actually received with a larger set of "several hundred telephone calls" is outside the realm of good faith mistake.

Should Gorman wish to defend the technical veracity of Paragraph 10 because he merely alleges that Wolpoff's calls were a subset of the Defendants' calls, and not that Wolpoff made all of the "several hundred telephone calls," the Court reminds Gorman of his statements at the April 25, 2006 hearing. The complete absence of evidence in the record to support his allegations that Wolpoff made any serious portion of the "several hundred telephone calls" suggests that Gorman, at best, failed to conduct a reasonable inquiry, and, at worst, made deliberate misrepresentations to this Court. *See Mezzetti v. State Farm Mut. Auto. Ins. Co.*, 346 F.Supp.2d 1058, 1067 (N.D.Cal.2004) (noting that "[g]obbledygook can be no less obfuscatory than an outright lie").

Accordingly, pursuant to Rule 11(c)(1)(B), the Court orders Gorman to show cause, if any, why Rule 11 sanctions in the amount of Wolpoff's attorneys' fees and costs following the filing of the SAC should not be awarded. *See, e.g., Terran v. Kaplan*, 109 F.3d 1428, 1435 (9th Cir. 1997).

## V.  CONCLUSION

For the reasons stated above, MBNA's Motion for Summary Judgment is GRANTED. Wolpoff's Motion for Summary Judgment is GRANTED in favor of Wolpoff, but Wolpoff's request For a Finding of Bad Faith under 15 U.S.C. § 1692k (a)(3) is DENIED.

The Court orders Gorman to show cause, if any, by filing and serving a brief on or before July 31, 2006, why sanctions under Rule 11 should not be imposed for the amount of Wolpoff's attorneys' fees following the filing of the SAC. Wolpoff may file and serve a responsive brief on or before August 25, 2006.  A hearing on the order to show cause re:  Rule 11 sanctions is scheduled for September 18, 2006 at 9:00 a.m.